141019 International Union United Automobile Aerospace and Agricultural Implement Workers of America v. General Motors Arguments not to exceed 15 minutes per side. Mr. Roth for the appellant. May it please the Court, I'm Andrew Roth for the plaintiff appellant UAW and I'd like to reserve 5 minutes for a rebuttal of my name. Your Honors, UAW's claim in this case is that in June of 2007, in the course of the Delphi bankruptcy proceeding, Delphi, UAW and pre-bankruptcy, the pre-GM bankruptcy, a company called Old GM, entered into a tripartite agreement under which Old GM took on a contingent $450 million payment obligation to a health benefit trust known as the DCB. Then when Old GM went into bankruptcy and was sold to New GM under 363 of the Bankruptcy Code, UAW's claim is that New GM took on, assumed in the Master Purchase Agreement, which was approved by the Bankruptcy Court in the Old GM bankruptcy in a sale order in July of 2009, New GM assumed that $450 million obligation. Can I ask you just a bankruptcy-related question? I'm not sure I've seen anyone mention it, so it probably means I'm off here. What's hard about this case is that there's very little mention of the $450 million obligation in the course of the 2009 RSA or during the bankruptcy. What happens if the opposite is true, that someone, as Old GM is entering bankruptcy, says, whoa, UAW has this $450 million claim, yes, it's contingent, but I didn't think contingent claims are outside bankruptcy. Had this been mentioned before the bankruptcy, isn't it incredibly likely that UAW would not have gotten $450 million? I mean, I just can't imagine the other factors. No, I mean, the objectors, there were objections filed in the bankruptcy proceeding, and the objections were that UAW was getting too sweet a deal. Right. If that had been disclosed, and it was GM's, you know, GM has the disclosure of it. I'm not really blaming anyone. I'm trying to understand. It would have lent an additional force to their objection, but marginally so, because… Well, why marginally so? Well, because under the VIVA agreement, New GM was taking on $20 billion. It was already an extremely sweet deal. It was already a sweet deal. No, in all seriousness, I mean, this $450 is a lot of money, but in the scheme of things, it was not. So, you're, it sounds like you're agreeing with me, but you're saying don't worry about it. No, no, I'm saying there may have been a failure. Can I ask a question? Sure. Seriously? Sure. Okay, wait till the question's done. I'm sorry. I'm not. I'm sorry. Okay, so what I hear you saying is yes, had this been explicit and identified, creditors would have objected. So yes, it would have been a relevant part of the bankruptcy proceeding, which is unfortunate. That's not done yet. But your second point is don't worry because there already was going to be a $20 billion commitment. It's hard to see how it would have made much of a difference. So the implication on my suggested question, which it is there, is $450 seems a little unfair because it seems like some of it would have been cut had people in the bankership know about it. Your point would be fine, we'll take it. It would have been cut to $440, $430. I think the reality is that it was not a material – it was a default on GM, on all GM's part, by not disclosing it. It was a marginal harm to the creditors. It would have added a marginal amount of fuel to their objection that this sale – there were objections by bondholders that this sale should not be approved by the bankruptcy court because among other reasons, UAW was getting too much. This would have added this much, a very limited amount of credence to that objection. But I imagine in the scheme of things, the objection would have been overruled. But the harm – GM wasn't harmed by that. If anybody was harmed, it was the bondholders. The UAW certainly – they weren't – It's not so much who was hurt. It was who was benefited by the silence. Well, but again, it wasn't – UAW was not a part of the proceeding. They supported the sale order, but GM had to make a case. GM did not participate in bankruptcy. No, they weren't a part of it. You don't have to be a part of it to participate in bankruptcy. They absolutely participated in the bankruptcy, and they did not – but here's the thing. I think this raises an important issue, Your Honor. Because it would have blunted, again, to a very marginal degree, the objection that the UAW was getting too much money out of. You've answered the question, so I interrupted where you were going. So I think you're going to go to extinguish it. So there you are. Well, I was going to first make the threshold point that, yes, there was no dispute that the sale agreement – that there's no reasonable dispute that – and GM never disputed it in the course of this proceeding – that under the term – it didn't specify 450 million, so that wasn't disclosed. But it was clearly part of the – under the master purchase agreement and the sale order, all of old GM's obligations were assumed under the UAW collective bargaining. All liabilities. And it also wasn't disputed that the MOU was part of the UAW collective. In 2007, MOU was part of the collective bargaining agreement. Therefore, putting aside the question of, you know, whether it was advertised, whether that point was made by old GM or the UAW or any bargaining proceeding, it was, in fact, assumed. And the district court held otherwise. The district court's holding was – Let me take you to my bottom line, and I understand what you're just saying. There's a good case that what the district court said on that was not correct. But if you go to the 2009 RSA Section 5D, maybe we're getting there in terms of the extension. Yes. But that 5D says – you know what I'm going to say – that all obligations in any way related to retiree medical benefits, dot, dot, dot, all provisions in any way related are terminated and amended. So the fundamental understanding that all new GM obligations are terminated. So how do you get around that statement? Easily, Your Honor. You have to read the whole agenda script in total context. All GM obligations regarding retiree medical benefits are terminated as set forth in this settlement agreement in order to achieve the fundamental understanding. As set forth. What does the settlement agreement set forth? It sets forth – No, but you went on that the fundamental understanding that all new GM obligations regarding retiree medical benefits for the classically covered group are terminated. Terminated, comma. As set forth in this settlement agreement. Is that in both places? Here in 5D? 5D. Just so we're right because I have followed some of it with dots. There are two places where the word are terminated occurs. Does the as set forth occur among both places? Yes. It says – no, it's in the second place. It first says are terminated on the implementation date. Okay. That's critical because the implementation date is the date when new GM no longer has a retiree health – they no longer have an obligation to provide benefits. And that obligation – that's the fundamental understanding of this agreement. That there's no more obligation for GM to provide the benefits. And that obligation is shifted on the implementation date to the new VIVA and the new plan. So in context, when you're talking about are terminated on the implementation date, as set forth in this agreement, to confirm the fundamental understanding, it is absolutely clear in context that what's being discussed here is – and this is – Section 5 is the provision of the agreement that deals with the termination of GM's obligation to provide retiree health benefits and the transfer of that obligation to the new plan and the new VIVA. So – What about the release? The release also – again, it's interesting. GM says that the release says – releases all obligations concerning retiree benefits. It doesn't say that. It says all obligations with respect to the provision of retiree benefits. So the release – Here's the language I'm just looking at. Yes. So you respond to the concern as related to any of the claims in Section 1 and 2 of the GM Act concerning the provision of retiree benefits? Concerning the provision. But provision is the key word. Because that's the fundamental understanding of this agreement, that you have to – Okay, I'm just trying – are you making the point that these are contingent and therefore it couldn't have covered it because the obligation might or might not arise in future? No, I'm arguing that you have to draw a distinction between the obligation to provide benefits and the funding, the payment obligations that go to fund the benefits. I see. What I'm saying is 5B, 5D, the release 25, they all deal with a specific subject matter, which is the fundamental understanding – this is the fundamental understanding of this agreement, that new GM is out of the business of providing health benefits. They're not providing it anymore. Those benefits in the future are now going to be provided by this VIVA. GM's out of it. But the fundamental understanding then doesn't say – and you're going to pay us $450 million. Well, this agreement doesn't deal with the – the $450 million obligation is under an entirely separate contract that was agreed to in the Delphi bankruptcy proceeding. Wouldn't you agree that this was covering a lot of different obligations under a lot of different collective arguments? Absolutely. A lot of different pieces of litigation, but not this one. Your Honor, the – in 5D it says all obligations arising under a lot of collective bargaining. This court has a lot of experience with retiree health benefit litigation. Your Honor has had a particularly lot of experience with it. And so, as Your Honors know, when you have retiree benefits, your obligation, your benefit as a retiree, it depends on the collective bargaining agreement that was in place when you retired. So, when you're dealing with years and years of retiree benefits, of course, a lot of collective bargaining agreements are implicated. So, in 5D, what this agreement is saying – It's sweeping lots and lots. It's sweeping – Not this one. Well, this one – this one has nothing to do with the provision of retiree health benefits. This is a – the 2007 MOU was not – the $450 million doesn't impose an obligation one way or the other, Your Honor. Isn't it a provision of an applicable continuing collective bargaining agreement contract letter of understanding in any way related to retiree medical benefits? It is not. Because – because you have to be – I mean, that – The money – the money isn't related to retiree medical benefits? That's what you have to be saying, isn't it, that it is not in any way related to retiree medical benefits, even though that's what the 400 million – No, that's not – Your Honor, what I'm saying – what I'm saying is two things. First of all, this phrase has to be read not only as a whole, but in the context of the entire – this Court has said it a number of times. You can't read contract language in isolation. Well, I have a question about the contract language because some of it is – might make it more significantly difficult for you to deal with, but some of your extrinsic evidence is clear on the position that you take. How do we get to extrinsic evidence in light of the wording of the 2009 RSA? Well, I think you easily get to extrinsic evidence, Your Honor. I mean, if – this has been our central point all along. You've got an agreement that was – it was not in this line of agreements. It's a separate agreement in the Delphi bankruptcy proceeding. If the parties – if GM was going to – had an agreement with the UAW to extinguish that separate payment obligation – it's not an obligation – it relates to the provision, but it's a payment obligation. If there was going to be an agreement to extinguish that payment obligation, it would have been – it would have been stated in clear terms, specific terms, because it's a one-shot deal. It's not a series of agreements. It's a one-shot contribution obligation that's triggered upon the happening of certain conditions. It is inconceivable – it is inconceivable that there would not be express language because there's suspended language all over this agreement, that they wouldn't single out that one outstanding payment obligation, because all the other obligations to the new VBIPA are laid out in Section 8, and those are the obligations to the new VBIPA. There's this separate agreement, which was assumed, which lays out a separate one-shot, one-time obligation to the D.C. VBIPA. It's not mentioned anywhere in the agreement. That doesn't cut against the UAW, as the district court said. That cuts decisively against General Motors because they would have mentioned it. They would have just let that pass unmentioned, given all the other extinguishment language in this agreement. But at a minimum – So what I was going to ask, and I think you might have just answered, was, you know, you're saying, yes, this covers lots of agreements, but these were agreements that related to both the bargaining obligations and the art demand and the question of what the obligations were to retirees, as opposed to this mechanism that developed, you know, 10 years ago of separating from the obligation and giving the money. And so when you look at 5D, is it true, and I assume the way you're arguing it, it must be, that there's nothing covered in 5D – let's assume for the sake of argument that 450 is not covered – there's nothing in 5D that one can characterize as VBIPA or VBIPA-related? Is that accurate? I assume that must be. I don't see you in the argument. Well, I mean, is VBIPA related in the following sense? Are there other VBIPA-related obligations covered by 5D? Because if that's true, then I'm not understanding. No, no, no. Not payment obligations. The obligation of the VBIPA and the plan to provide is what 5D deals with. That's what – if you look very carefully at Section 5 – So you understand the point I'm making? Yes. If there were prior things covered by 5D that were VBIPA-related, it would be kind of strange not to cover the 450. There was nothing VBIPA-related in this. If I'm answering your question, there was nothing VBIPA-related in these applicable collective bargaining agreements, contracts, letters, and understandings. That reference is clearly a reference to prior collective bargaining agreements and side letters and SPDs, summary plan descriptions. And to the point you were just making earlier, elsewhere in the RSA, there's a whole separate provision that deals with the main VBIPA. Correct. Let me be precise. Which deals with the funding obligations to the main VBIPA. Right. But it is drafted very carefully to say, GM shall have only the following funding obligations to the new VBIPA. It doesn't say a word about funding obligations to the DC VBIPA. And that's because this agreement – this is critical, Your Honors – this agreement was just a renegotiation of the 2008 RSA. Every provision – 5D, 8 – every provision was taken word for word out of the 2008 RSA. So what's the relevant negotiating history of these provisions that GM relies on in its extinguishing defense? The relevant negotiating history is when those provisions were negotiated in 2008. And in those negotiations, not only was there no discussion of any extinguishment or the separate funding payment obligations to the DC VBIPA, there was a mutual understanding upon the part in setting the rate of contributions to the new VBIPA. It was assumed that – because Delphi was about to come out of bankruptcy at that point – it was assumed by the parties in their calculations – and we laid this out totally undisputed – that that $450 million would soon come into the DC VBIPA because Delphi was about to emerge from bankruptcy. Is there a page in the record where there shows something – shows $450 brought in? We did not put in – we did not put in all the background calculations, but there is a declaration – undisputed declaration from the union's chief negotiator, Dan Sherrick. And I can get you the site. I mean, it's in our brief, but – We can find it. The guy's name is Sherrick. Dan Sherrick. It's – he lays this all out in his declaration. This declaration is always looking for times it's not expired unless my colleagues have more questions. We can find it. Yes, it's – Thank you. Now, are we 30 through 12? 30 through 12. Thank you. Thank you. Good morning, Your Honors, and may it please the Court. Shai Goretzky representing General Motors LLC. I'd like to talk about the language of the all-encompassing 2009 RSA. I'd like to address Judge Stransky's question about extrinsic evidence. And lastly, I'd like to get to the alternative ground for affirmance here, which is that even if the conditional obligation had survived the RSA, the conditions for it have not been and cannot be satisfied. With respect to the language of the 2009 RSA, the Court has already pointed out sections 5D and 25. I'd also like to direct the Court's attention, if I could, to section 14, and in particular to sub 3 of section 14. And that provision provides that the UAW agrees not to seek to obligate new GMs to both provide or assume the cost of retired medical benefits for the class or the covered group through any other means. So this language of the 2009 RSA is far more expansive than pertaining just to the new VIVA and far more expansive than pertaining just to the provision of retiree health care benefits. You cannot, either as a matter of common sense or as a matter of the language of the RSA, separate out the provision of the benefits from the payment for the benefits. And the other... I also was opposing argument to that is that the introductory phrase of 14 says that what the promise is that you agree not to seek to obligate the new company to, and then you yield that risk. It explains to me why seeking to obligate, which is a future motion, seeking to obligate, his argument is that that doesn't apply to what you are already obligated to do. How do you understand that? This very action is an action that's seeking to obligate new GM to make a payment that hadn't been made and didn't have to be made as at the time of the bankruptcy and as at the time of this 2009 RSA. So the notion that section 14... I'm sorry. Maybe we need to walk back through that because I'm a little confused. Sure. I was trying to understand the 2008 arrangement did not mention the $450 million, correct? Correct. The Henry II agreement? Yes. So the Henry II agreement did not mention the $450 million. The Henry II agreement, however, did have clear language on its face that it resolves and settles any and all claims for GM contributions to the existing external VIVA, which is the DC VIVA. Then help me understand why the 2008 implementation agreement specifically says it would be paid. So a couple of points about that. First of all, all of this, of course, is extrinsic evidence to the 2009 RSA, which both parties agree and the UAW has conceded repeatedly, including before this Court, is unambiguous. So there's no basis to be considering any of the backstory and any of this extrinsic evidence regarding a prior agreement to interpret the 2009 RSA, which is the agreement before the Court. That said, I'm just trying to understand. It seems to me in reading your briefing that you're saying we didn't promise to do it, then we resurrected it in the implementation agreement, and then we unpromised it again in the 2009. I don't understand your position on how you got to 2009. Can you just walk me through it? Sure. So the 2008 agreement, the Henry II agreement, by its terms, did away with the $450 billion obligation. Without ever mentioning it? Without mentioning it, because by the very nature of these sorts of agreements, both Henry II and the 2009 RSA, they're all encompassing agreements. There are other examples of very substantial obligations, totaling billions of dollars that were indisputably done away with by the 2009 RSA that are not specifically mentioned. That's the effect of this sort of language that talks about what all the obligations are and then sending them forth. Just to say that again, because it was responding to a question I was going to ask. The question is why would GM not mention this? And you were just saying, well, there were lots of things not mentioned. Give me a capture of that. What do you mean by lots of things? Is it another $5 billion that was released? I can give you a specific example, which is that during the negotiations over the 2009 RSA, GM put forward a presentation about how it proposed to restructure its obligations. One aspect of that presentation was to zero out the $450 million obligation. On the same slide, and if you look at our statement of material facts, filed in the district court, it's filed under seal so I don't have a page ID number, but it's our statement of material facts, GM's, at paragraph 80. It contains the site to the actual exhibit, which I'm looking at. It has the $450 million obligation zeroed out. It has three other obligations underneath that that total about $1.7 billion that also are being zeroed out. None of those obligations are explicitly mentioned in the 2009 RSA. Yet there's never been any question, and I may not have been listening carefully enough, were those also obligations to UAW? Those were HIPAA obligations. Those are all also zeroed out. None of those are expressly mentioned in the 2009 RSA. Why didn't GM have brought this up in dealing with the argument that UAW was getting a sweetheart deal? It seems like a really natural response. What do you mean sweetheart deal? We're just releasing $450 million. In other words, I mean there was talk during the bankruptcy that retirees were getting a very good deal out of this and were getting treated better than other long-term all-together creditors. Yeah, and so why wouldn't someone have said, well, it's not that great. This deal wipes out $450 million. The dynamics of a bankruptcy are complicated. The UAW supported this deal actively, and, in fact, there's testimony in the record that the UAW indeed thought that Amoeba was adequately funded. And I wasn't personally involved in the bankruptcy, but I presume that GM didn't want to undercut that. Had you finished your walkthrough? I was hearing you in response to Stranch's question. You got up to the 2008 Henry II, $450 is out because it's all-encompassing, and then you were going to keep walking. Right, so we're almost to the implementation agreement, which is what I don't understand. So the language of the 2008 Henry II agreement is all-encompassing and eliminates the $450. Now, one thing to bear in mind in terms of the background of what was going on in 2008, all of this was being negotiated in 2007. Everybody at that point assumed that Delphi would successfully emerge from bankruptcy. And at that point, if the conditions of the 2007 MOU were satisfied, the $450 might well be payable. And so for that reason, it may well be, if you start looking at the extrinsic evidence, that in the negotiations leading up to Henry II, the parties may well have assumed that the $450 would be payable. As it turned out, however, Henry II was approved much faster than anybody thought, and Delphi took much longer to complete the bankruptcy process, and completed it in a way inconsistent with the 2007 MOU. But both parties negotiated the 2009 RSA model. All GM and the UAW were negotiating both agreements. But what's common to both is that they have this all-encompassing language about doing away with preexisting— Okay, but you took the implementation agreement. Oh, so— Wait a minute, why? All right, you've got this, you've got the all-encompassing, and now you're at implementation, and you turn over in the end, and here's how we're going to do it. So— Well, we're going to say that the payment required by Section J.2 shall remain payable— To be— —and set forth in the restructuring MOU. To be clear, the implementation agreement is an implementation agreement related to the 2007 MOU. That's the tripartite deal involving GM, Delphi, and the UAW. And what the— September of 2009, correct? Yes, that's correct. And what that implementation agreement does is it modifies certain terms of that 2007 MOU, and it expressly modifies those terms, but it doesn't modify any other terms. If you look at the implementation agreement itself, the closing paragraph, other than as modified by this implementation agreement, the restructuring MOU, which is the 2007 MOU, remains unchanged. Notwithstanding that, the parties expressly said the payment required, the 450, shall remain payable. So the fact that they included this additional language about the 450 remaining payable, even in the face of other language that says nothing else has changed about the 450 besides what we say here, shows, in fact, that they were bringing back a $450 million obligation that otherwise had been done away with. If not for that, there would have been no reason for them to specifically say the 450 shall remain payable. Now, in terms of what was actually going on about why GM would agree to bring this back, there were back-and-forth discussions at the time between GM and the UAW, and in essence, GM agreed to bring back this conditional $450 million obligation in return for certain concessions concerning funds that otherwise would have been in need. And at that point, that was a tradeoff that GM was willing to make. But again, to go back to my broader point, all of this is, as I think this discussion shows, there's an extensive extrinsic evidence background to all of this. None of it is crystal clear. And regardless of that, extrinsic evidence is no— there's no legal basis on which to look at extrinsic evidence about a separate agreement to interpret the 2009 RSA when both parties agree that the 2009 RSA is unambiguous. The 2009 RSA has to be interpreted according to its terms, and its terms, in an all-encompassing way, do away with any obligations to fund the VEBA. But you would say that you can look at— you can look at the language itself and look at extrinsic evidence for the purpose of understanding the language as opposed to disputing the language. Is that correct? I would say that if the language is clear, there is no need to look at extrinsic evidence at all. The most that extrinsic evidence can do under this Court's case law is to confirm the existing language, but not to undermine it or vary it in any way. And so extrinsic evidence about a prior agreement, not even the agreement that's being interpreted here, first of all, shouldn't be considered when the agreement here is unambiguous, and second of all, can't be considered to vary the terms of the agreement that's at issue here. Counsel, if we then go to the allegedly unambiguous language in 5D, which I was pressing your adversary on, you said, well, you have a dot, dot, dot when I read it about— they are terminated on the implementation date. I'm looking at your page 7. Yours is fuller than the one I was reading from in a different place, but you have a dot, dot, dot in that same place. Can you address the import of any of A in the original words on the implementation date? So there is no import to that. The effective date of the agreement is before the implementation date. The implementation date, I believe, was either December 31st or January 1st of 2010. The effective date was the previous summer in July of 2009. As of the effective date, all of the provisions of the 2009 RSA have become effective, and those provisions do away with all of these VIVA liabilities, whether to the new VIVA or to the DC VIVA, other than those explicitly set forth here. Even within 5D, it talks not just about— I hear you right. You're saying that all of this goes into effect on the effective date, which is earlier, so what is the use of having the words on the implementation date? The implementation date is the date on which the transfer occurs of the funds from the DC VIVA to the new VIVA. That's when everything is consolidated into one VIVA. But there's other language in Section 5D and Section 14 and other provisions that's not tied to the implementation date. It is that as of the effective date, all of GM's obligations other than those set forth are terminated. That's what the last part of 5D that the Court was focusing on earlier says. That's what Section 14 that I quoted from at the beginning of the argument says, that as of the effective date, GM has no further obligation to provide or assume the cost of these benefits. If I could briefly talk about the conditions argument. So even if the $450 million conditional obligation had survived bankruptcy, and it theoretically still exists after the 2009 RSA, Section K2E of the 2007 MOU provides that the $450 million will be payable only if there's a comprehensive settlement agreement between GM and Delphi, and the plan of reorganization of Delphi is consistent with all of the terms of the 2007 MOU and of the settlement agreement. The union has made no showing that any of the terms of the 2007 MOU have been satisfied. Most fundamentally, the 2007 MOU contemplated that Delphi would emerge from bankruptcy as a functioning company employing UAW workers having contributed $200 million to four particular sites that were important to produce parts that GM required. None of that happened. Delphi emerged from bankruptcy as a shell of its former self, not employing UAW workers, never made a $200 million contribution. GM took over the sites and GM took over employment of the UAW workers there. And so the conditions for the $450 million haven't been satisfied and cannot be satisfied at this point. And the UAW's only argument about that in the brief is, as long as there was some sort of a settlement agreement that GM agreed to as a business matter, then that satisfies the requirements for the $450 million. That's simply not what the 2007 MOU says. The 2007 MOU requires compliance with A, the settlement agreement, and B, all the terms of the 2007 MOU. The 2007 MOU terms serve as a baseline, and those baseline terms have to be complied with in addition to any settlement terms. Besides the fact that, as we argue in our brief, Delphi's bankruptcy plan was not also consistent with the settlement between the parties, but I think the more fundamental point is the UAW makes no showing that Delphi emerged from bankruptcy in a way consistent with the terms of the 2007 MOU require for payment of the $450 million. Any other questions from my colleagues? Thank you, counsel. Thank you. Thank you, Your Honor. I do want to go back to focus on 5D, given your questions on that, Judge Boggs. And I want to make a couple of points. In addition, I think the on the implementation date and the as set forth in the settlement agreement are critical words that can't be ignored here because as set forth on the implementation date, that's when the transfer of the responsibility to provide takes place. That's why in context, the obligations that are being extinguished here as the obligation to provide has nothing to do with the funding. Because on the implementation date, that's when the transfer of responsibility to the new people takes place. Also, as set forth in this agreement, this agreement only sets forth an extinguishment of the obligations to provide. It has specific funding obligations. So as set forth in this agreement, this can't be a broad waiver that covers funding. Could you respond to that? What's your response to this Section 14 language? If I may just complete the 5D point, and then I'll get to 14. 5D is not a self-executing provision of this agreement. It says what the sale order, the approval order of the bankruptcy court needs to include. As the bankruptcy court said, when GM went to the bankruptcy court to see if it could get the bankruptcy court to assert jurisdiction over it, in its venture, the bankruptcy court said, I didn't even consider this issue. I'm sending it back to the Eastern District. I just took OGM as the common practice. It drafted the approval order. I just signed off on it. I was just satisfied that the UAW and GM had a deal. That was good enough for me. I didn't really delve into it. The approval order that GM drafted says, with regard to 5D, all obligations of the purchaser and the seller to provide are extinguished. Such obligations are extinguished. And therefore, the provisions of the GM plan, which only govern the provision, have nothing to do with the funding. Those plan provisions are terminated as of the implementation. What was the page you're citing? This is RE6021, page ID 4051. That's the provision of the sale order. As to 14, the only point I would make is Judge Schranch is exactly right, that the seek-to-obligate is forward-looking language. And it clearly rounds out the agreement by saying, the agreement, here's what your funding obligations to the new VBA are, and you can't go ahead and five years later start asking us for more, with one exception, if you're willing that that money comes out of the active's money, we'll allow that. So it's clearly designed to the future in terms of the UAW coming back after this agreement is signed and seeking to obligate GM to take on new payment obligations. I think we were very quick over this, but it sounded like he was lettering that this lawsuit is seeking to obligate them to pay us. Well, I mean, you know, that's semantics, Your Honor. I mean, in some way, but it's really, I mean, the more proper way to look at it is seeking to enforce a pre-existing obligation. You wouldn't say this is an obligation action. You would say it's an enforcement action. In light of the language in this 2009 RSA, there's some pretty tough language in there for you. So my question remains, can you, how do you get to it? Can you get to it? Yes, I think you absolutely can. I mean, our position is that that tough language, as it were, in the context of the overall agreement, you know, where it's placed, you know, the language, the fact that it doesn't specifically mention the 2007 separate agreement out there. I think we know we all have a problem here. Everybody's arguing about what's not fair. Right. I mean, that's what we've got to do. We're talking about what's not fair. We would argue that that unambiguously, you know, he says we concede it's unambiguous. We argue that it's unambiguous in our favor, that that language can't, unambiguously not extinguishment of that $450 million obligation language. That's our position. But at best, this is very arcane language in a very complicated agreement, as your Honor says. At best, it's ambiguous in GM's favor on the extinguishment question. So at best, there is occasion to resort to extrinsic evidence. Using extrinsic evidence from another agreement that they're making the point it's a little odd that we talk. You know, we have the agreement in 09. That's the agreement that you claim is a fact of argument. It's ambiguous. Right? Right. So I can imagine some worlds in which you might use extrinsic evidence related to his argument, but I'm not sure I understand why that's true here. Well, that's what's interesting, your Honor. It's not really extrinsic evidence from another agreement because every piece of language that they rely on in support of their extinguishment defense came in in 2008. So there is no negotiating history of that language in 2009. It was just taken verbatim from the 2008. But 5D of 2009 is the same thing. Word for word, your Honor, 5D. Of Section 5. Section 5? I think it was actually 5C because there were some other changes that were made. But every piece of language, every piece of language, the fixing cap language of Section 8, the seek to obligate language of Section 14, the waiver and release language of Section 25C, every piece of language, they've never disputed this, was just drawn. And that's because the only change... Sounds like a math problem in a computer. No, it's not. It wasn't an accident, your Honor. Because the only change from 2009 to 2008 was the federal government said, we're not supporting your bankruptcy. We're not giving you billions of dollars. Unless you equitize half of the $20 billion obligation to the new VBA that you took on in 2008, that was the loan agreement with the federal government, said you have a settlement agreement, this 2008 agreement, you have to equitize half of that $20 billion because you're bleeding cash. We're not giving you money unless you get rid of half of that cash outage. Thank you.